Good morning, and may it please the court. I'm Robert Most, I'm representing appellant Johnny Anderson in this case, and I will reserve a couple of minutes if I could for rebuttal. It's rare that a court has an opportunity to address an issue of the first impression in the federal courts concerning whether a particular medium of expression is protected by the First Amendment. But that's what this case presents. The question is whether tattooing, the art of tattooing, is in fact expression protected by the First Amendment. The district court granted summary judgment, and the issue is before the court as an issue of law. All of the facts are contained in a relatively small record and are fairly straightforward. I submit that the district court basically got it wrong. The district court held that the process of tattooing is separate from the tattoo itself, and that while the tattoo might be protected by the First Amendment, the process by which a tattoo is applied is not protected, and therefore granted summary judgment to the city. The city's law here is a complete ban on tattooing anywhere within the city limits of Hermosa Beach. How far does this apply? And I'll ask the city's attorney if you can't give me an answer. But what happens if somebody buys a tattoo needle and starts operating out of their home for their friends and family? That would be illegal. That would be illegal? Yes. This is a zoning law, and under Hermosa Beach law, well, I don't know. Actually, I take that back. So we're not charging anything. I'm tattooing my friends. I don't know if that would be illegal or not. I would hope so. Okay. What about cosmetic tattooing? I don't believe that is illegal, provided it's not the primary business. For example, permanent makeup, which is done in beauty salons, uses tattoo equipment, but it's not for artistic purposes. It's not for communicative purposes, and it normally isn't the primary function of the business. They apparently do allow cosmetic tattooing. Right. And they would also allow, for example, body piercing to the extent that ears are pierced in jewelry stores, even though they wouldn't allow a shop that does body piercing. What if we had a barber shop that says free tattoo with every haircut? I don't know. I don't know that there's such a shop or such a – I wouldn't – again, I would hope that would not be allowed, because one of the key things here is that I think tattooing should be legal, but I also think it should be regulated, and I think the people who do it should be supervised. And the danger is, in the examples Your Honor has given, if it's done for friends and family or by barbers, it might not be sanitary. Mr. Moskowitz, you only brought up a First Amendment claim here. Is that correct? You didn't bring an equal protection claim. No, I didn't. Okay. And that's right. It's purely on the grounds of the First Amendment. And I want to submit that, first of all, I think the tattoo itself, the words or pictures that a person puts on their skin is expression, and I don't think there's much doubt about that. If I – it doesn't mean that I can wear a tattoo under any circumstances or display it under any circumstances. There are certainly tattoos that are menacing and horrible. There are gang tattoos, for example, which have all sorts of ramifications, but they are intended as communication. They show affiliation. I'm one of you. And I'm not saying that those can't be used for bad purposes, but they are nevertheless expression. Certainly, the kinds of tattooing that my client does, which are images of things that, you know, faces, pictures, drawings, fall comfortably within the kind of art that is protected in cases like White vs. City of Sparks, which recognizes that all sorts of visual images, abstract, realistic, and so on, are all protected. The real issue here, I think the court got caught up on the continuum. You have speech, you have something called symbolic speech, and you have something called expressive conduct, all falling to some extent within the First Amendment. Speech, I guess, when I was preparing this morning and by taking a shower and rehearsing in my head, the arguments I might make this morning, there was no noise. There was nothing except electrons buzzing around my head. That's pure speech, I guess, and that's the only thing that is pure speech. Any other kind of speech includes conduct of one kind or another. As I speak here today, I'm making noise. If you take a newspaper as the paradigmatic example of free speech in some sense, printing out a newspaper involves having a physical place where it's written, having a plant where it's printed, having news racks where it's sold and distributed, having people driving trucks on the street. All of those things are physical aspects, absolutely essential to the communication that is embodied in a piece of paper that at least in the next few years I'll be able to open and then probably read it online after that. Every form of speech has physical manifestations. In every form of speech, those manifestations can be regulated, but you can't ban it just because there are physical consequences. In all the kinds of media that have come before the courts over the years, the courts have recognized that if it's expressive, if it expresses emotions, ideas, thoughts, and so on, then it's protected by the First Amendment. Then you look at the regulation. Billboards are an example. There are a lot of regulations of billboards. Certain cities can prohibit billboards, but you can still put a sign up advertising your house for sale because that can't be prohibited. So you can't prohibit all outdoor signs, but you can look at the kind of sign it is, look at what's appropriate, and impose appropriate regulation. Here we have tattooing, which is practiced in a store. It's no more – it's what goes on in the store that offends people, perhaps. Some people don't like tattooing, but what goes on in the store is really no different from what goes on in a beauty salon or a barbershop or a dental office or any one of a number of other retail establishments in terms of its impact on the neighborhood. Some states have limited tattooing to licensed physicians. If the state enacted that, would that be a constitutional time, place, or manner restriction? Well, actually, as I understand it, that used to be the law in South Carolina and in Indiana. There are two appellate cases out of those states where that was the limit, and those limitations have been repealed. I don't believe that would be an appropriate limitation. But you'd have a completely different argument. It wouldn't be a First Amendment problem, would it? It would be – well, I think it would be – It might be a time, place, or manner question. It would be a time, place, or manner question. At least they would allow tattooing. They haven't prohibited it completely. And then the question is whether there's any rational relationship between being a physician and being qualified to apply. Is there any other community in Southern California that you know of that bans tattooing? Any other city? Yes. It's widely banned. One of the reasons we're here is that Mr. Anderson – and this is in the record – Mr. Anderson grew up in what's called the South Bay area of Los Angeles County, which encompasses a number of cities – Torrance, Redondo Beach, Manhattan Beach, Hermosa Beach, Lawndale, Hawthorne. All of these cities prohibit tattooing. And so there's a wide swath of L.A. County – in fact, most cities in L.A. – most individual cities in Los Angeles County prohibit tattooing – Beverly Hills, Santa Monica, El Segundo, other coastal cities. All of them through the land-use type device? Exactly. It's only allowed if it's zoned and it's not zoned for those cities. Some have – Torrance, for example, has a direct prohibition. There were direct prohibitions that enacted in the 1950s when tattooing was considered suspect speech for whatever reasons and when there wasn't as broad a recognition of the kinds of expression that are embodied within the First Amendment. There isn't anything in California law either at the county level or at the state level that would preempt any of that and force cities to accept tattooing? No. There is in the works and has been for several years a statewide law that would regulate tattooing by imposing certain health regulations. And Los Angeles County has in place a comprehensive sanitary tattooing ordinance which cities can opt into on a city-by-city basis. It doesn't affect their zoning regulations? It doesn't affect zoning in cities that are not – that are separately incorporated. And, for example, Los Angeles City does not subscribe to the county health regulation, but other cities in the county do. Los Angeles City does allow tattooing, and that's why there seem to be quite a few tattoo shops around in this county, but they're mostly in L.A. City. There are cities – I don't want to get too technical here, but Long Beach has tattoo parlors dating back to World War II, but they're grandfathered in and no new tattoo parlors are allowed. But the kind – the court relied on cases like O'Brien and Spence and the flag-burning case to say that the act of tattooing is not protected and also relied on a series – there's a district court case from about 30 years ago called Yerkew from Minnesota in which a judge was asked to approve a temporary tattoo booth at the Minnesota State Fair, and he said he wasn't going to – he didn't find the fair's refusal to allow a temporary tattoo facility to be violative of the First Amendment. This was long before the First Amendment was found to encompass things like painting and music and other forms of expression, and he was clearly focused on this – the possible risk of injecting ink into the skin, and that is a legitimate governmental interest. I think that it's clear in the papers, and Mr. Anderson has always taken the position that he practices sanitary tattooing. It's obviously in the interest of a legitimate tattoo artist to perform safe tattooing because the tattoo artist is at the greatest risk. It's like doctors are very careful about transmitting blood borne illness, obviously for the protection of their patients but also for their own self-protection, and that operates here as well, and there should be a licensing system or health regulation system in which these things are looked at, but that's the remedy. The problem is the possibility of infection. The remedy is to have sanitary conditions. In O'Brien, you have a situation in which the problem was, as defined by the court, that people had to have their Selective Service cards in their possession at all times, and the law prohibited mutilating it or destroying it. Obviously, that law – if you mutilate or destroy your card, you don't have it, and therefore you're frustrating the Selective Service system. The only remedy, at least the court said, the only remedy available to prevent that harm was to prohibit the conduct. That's a rare case. There are very few cases in which the courts have upheld that, and even under the so-called O'Brien test, it really amounts to what becomes a time, place, and manner test. You look at the governmental interest. You see if the regulation is merely focused to upholding that interest, and then you decide whether it's reasonable. But the thing is that tattooing is different. Tattooing is much more like printing a newspaper or painting a painting or playing music. These are physical things that are necessary. They're inherent in the expressive act itself. You can't – burning a piece of paper is not an expressive act. If it happens to be a draft card, it may have communicative purposes. But the burning part of it, or for that matter burning a flag, only has a communicative aspect because the flag itself is a symbol. Here we're dealing with the mechanical aspects of a mode of expression, and tattooing may be lowbrow art. It may not be Rembrandt, but for the people who do it and the people who want to receive tattoos, it is a very important form of expression and something that should be allowed. And to separate out – there's no other area of speech in which the mechanical process of putting that speech out, of producing it, creating it, is separated from the speech itself. Motion pictures – and we live in Hollywood – motion pictures are enormously burdensome in terms of the side effects. And, you know, motion pictures used to be printed on nitrate stock, and movie theaters could explode because the film would go up in smoke. I mean, things are allowed in the context of free speech, which are really dangerous. And there's no real danger here. There is no harm in the tattooing process when it's properly done. What we have here is we have an emotional reaction to something, to tattooing, a visceral reaction. I don't like it, and I don't like it. All right? I'd be the first to admit I don't have a tattoo, I don't want a tattoo. But there are many forms of speech I don't like. There are many forms of music that many people don't like. They'll listen to one and not the other, or they think it's all noise. But that doesn't mean it's not expression protected by the First Amendment. And that doesn't mean that you can say, yes, it's okay to have notes on paper, but you can't play the music because the process of playing the music creates noise. And you can regulate the time. You've got less than a minute left. Do you plan to save anything for rebuttal? I'll save my minute. Thank you very much. For what it's worth, I don't have a tattoo like Mr. Most, as well. May it please the Court, My name is John Cotty, and I am here on behalf of the city of Formosa Beach. We are here dealing with a zoning ordinance, a zoning ordinance coming to this Court bearing a presumption of constitutionality. The city's zoning ordinance, like most zoning ordinances, identify and regulate certain uses. In the city of Formosa Beach, tattooing is not a permitted use, and therefore it is an identified permitted use, and therefore it is prohibited to answer Justice Bidey's question. And I don't know that I did, but that was the crux of what you were getting at with Mr. Most. And I am not so eloquent as Mr. Most, so I will be brief. Mr. Most argues that this is a case of first impression. In fact, while this circuit has not considered the issue, this issue has been addressed in several cases, both at the state level and at the federal level, and all have concluded that tattooing, both the act of tattooing and the process of tattooing itself, is unprotected by the First Amendment. This Court in White v. Sparks, while holding that an artist's self-expression is protected by the First Amendment, it cited with approval in doing so to Berry v. New York, which of course stated that wherever the amorphous line between... Uh-uh. Berry said nothing of the sort. Berry cites a strange opinion saying that courts sometimes difficulty withdraw the line and cites the Minnesota case with the quotation you offer. There's nothing in Berry that reflects adoption of that point of view. Well, it is cited... I think if you think citing a string side of cases saying courts have drawn lines means that the Second Circuit necessarily adopts every one of those decisions, okay, that's your position, but I don't believe that. Very well. I think, frankly, there aren't many decisions that focus on tattooing. That's one of the problems we're sitting here with. We're out of a normal context. So why is it that tattooing is on the other side of the line in your view or in the city's view? Well, for several reasons. First, tattooing invades human tissue, and as Justice Fischer so eloquently stated in his declaration, you have a more likely chance of obtaining hepatitis C from a tattooed man. Please, the health thing is totally different from the health of the First Amendment. What's the difference? Get to the heart of it. The heart of it is that there is nothing inherently expressive about injecting ink into the skin. How about injecting ink into paper? That's the crux of it. Can injecting ink into paper be inherently expressive? It can be. But there is no protection for the actual canvas. See, this really isn't a health case. There are health issues, but I'm not sure that the subject into which the ink is injected, be it paper or skin, we all recognize that paper is protected. Why is skin different in terms of expression? Because there is no intent by the wearer of the tattoo to convey a message for all to see. Nothing inherent about wearing a tattoo. Mr. Most puts in his brief the airborne symbol. What is different about putting that on the skin versus putting it on a T-shirt? Or putting it on a piece of paper. Or putting it on a piece of paper. But on a piece of paper, it's protected. On a T-shirt, it may be protected. I absolutely agree. But, again, we're invading human tissue here. Okay. But that's a time, place, or manner restriction, it seems to me. I mean, we have ways of dealing. Just, you allow beauty salons in Hermosa Beach. And I gather that they are doing some tattooing there. There's some cosmetic tattooing. Tattooing eyebrows or eyeliner or things on people's eyes. And it's permitted there. And you are perfectly entitled to regulate and make sure that that's all very safe. That is correct. Do you allow doctors and dentists in Hermosa Beach? We do. Okay. And they're invading human tissue?  You have ways of dealing with that? We do. Okay. So what's the problem? Well, the city of Hermosa Beach should be able to make the legislative judgment that it shouldn't have to spend its very scarce enforcement dollars on adopting and promoting and enforcing the regulation of tattooing, especially when a tattooing, as Mr. Anderson's case, can be bought over the mail. There are no standards, no state standards regulating tattooing. There are no requirements to be a tattoo artist. There are no septic practices generally employed in the tattooing community. It's simply the city. Any reason why the city couldn't adopt all of the above? Because the city has made, again, made the legislative determination that it can't. Suppose the city decides it doesn't like the litter from newspapers. No newspapers can be sold in Hermosa Beach. You can go buy your newspaper in Torrance. Do you think that would stand up? No, because the. . . I think you really need to focus on the expression part. If you're trying to draw the line of this case, this is a facial challenge. And we ask you, why is tattooing on the other side of the line? And so far we keep hearing back regulatory time, place, and matter type limitations. Now, it may be that a reasonable time, place, and matter prohibition survives, but it hasn't been defended so far in time, place, and matter terms. So why is it not a proper. . . Why should it be defended now? Why isn't it proper expression? Because, again, there is no. . . It's important to seek, to look at what Mr. Most is seeking protection for. He's not seeking protection for the message. He's seeking protection for the act. And there is nothing. . . It's different than ward. Could the city ban printing presses because they don't like the noise that printing presses or the chemicals used in printing presses? Absolutely. If there is a functional equivalent where the same end product can be produced. And here we have that. You can put the airborne symbol on your arm in a myriad, in innumerable ways. Pen and paste. Airbrushing. Buy a Sharpie. There are any number of ways that you can put that symbol on your arm. We're not regulating the message. We're not even saying that he can't put that symbol, abstract, lowbrow, as he calls it, as it may be, on your body. We're simply saying that you can't do it via the use of an ink injection gun. That's it. That's all we're saying. Does the city ban the use of ink injection guns in private homes as well? The city zoning ordinance does not. But one would hope that that isn't going on. Again, the only penal code section on the issue is whether or not you can be over the age of 18. But owning a tattoo gun is not illegal in California. It is not. Presumably I could buy one on the open market and take it to my home and tattoo family and friends. I'm not charging them, so it's not a commercial establishment. We're doing it for our enjoyment. That is correct. Again, one would hope that that isn't going on. But it might very well be. But again, in the case of the printing press, if you could print that through the use of a Xerox machine, we don't use printing presses anymore. We don't use lead-based paints anymore. Can the city not say you cannot paint with lead-based paints? That's a method. That's a method of applying paint to a specific canvas, if you will. And turning to the canvas, can the city not say you cannot sculpt in ivory? Of course it can. The city can regulate the canvas. And it can? It's kind of news to me on lead-based paint, frankly. If an artist, if Picasso's doing his work in lead-based paint, you're telling me the city can say no more lead-based paint, you've got to use watercolors? Really? Do you have any authority for that proposition? I don't, Your Honor. Okay. There is the VOC. With regard to the VOCs, there is the, I might add the name if the case escapes me. But again, I would think that that would certainly fall within the city's purview, to prevent someone from using something that's harmful to the greater public or to the person itself. Certainly I think the city would have the authority to regulate that methodology. And again, the methodologies that Mr. Most repeatedly cites to Ward, Clark, Shuttlesworth, Hurley, those activities, the music, the dancing, the painting, they're all inherently expressive. When the words come out of the mouth or when the dance has begun, those are inherently expressive. There's nothing, again, no one's buying a ticket to watch someone put on a tattoo. Oh, that's quite, that's not true. We have TV shows on cable, which I now have at my house, and I've seen them. And he's from Vegas, so let's face it. I suppose the next question is, do you have a tattoo? In the interest of full disclosure, I do not. Okay, thank you. But please don't fully disclose. There we go. Going back to the expression aspect, tattooing, neither historically nor in today's society, even with LA Ink and the other shows that are on TV, which I admittedly have seen as well, tattooing has never been a venerable means of communication, ever. Well, I don't, that doesn't sound right either. If you talk to the Maoris, you're going to find out that you have a very, very different, a very different story coming out of Polynesia, where it has been, you know, hundreds of years of the use of tattoos, many of which are permanent. Well, again, historically in this country, tattooing has not been a means of, like leafletting, for example, or like the sound truck, which arguably can be regulated because of the noise it makes. Again, parades, newspapers, music are all inherently expressive. The use of the gun is not inherently expressive. And with that, I submit Mr. Coyne has any further questions. Apparently not. We thank you for the argument. And Mr. Mose, you have about a minute left. Thank you. Basically, I think the key here is that this is expression. It's all part and parcel of the same thing. The media, you know, not to be Marshall McLuhan or anything, but the medium is important to the message. It's part of the message. Injecting a permanent symbol or word on the human skin is different from a temporary tattoo, just as one wouldn't prohibit oil painting but allow tempera painting. And there's also a difference between expressive X and non-expressive X. When the painter comes to my office and paints it, it's not a work of art. In fact, the last time it wasn't even a work of craft. But if it's Rembrandt it comes out, I'm lucky, because then I have something that's protected by the First Amendment, and tattooing should be as well. Thank you very much. Thank you. We thank both counsel for their arguments in this interesting case. The case we just argued is submitted. We move to the last case on the argument calendar for today, Inease v. Emmett Construction.
judges: Noonan, Clifton, Bybee